**Affirmed and Memorandum Opinion filed March 1, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00553-CR

---

### WILLIAM EDWARD WRITZ, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1273276**

---

## M E M O R A N D U M     O P I N I O N

Appellant William Edward Writz was indicted on two separate counts of aggravated assault of a family member, and the two cases were consolidated for a single trial. The jury acquitted appellant of one charge and convicted him of the other. The jury assessed a punishment of five years of confinement and a $5,000 fine. Appellant argues on appeal that the trial court committed reversible error during the punishment phase of the trial by allowing testimony regarding the charge for which appellant had been acquitted. We affirm.

BACKGROUND

Appellant and his wife Lisa Writz share an apartment next door to Lisa's family's bar. Lisa was working at the bar on the evening of August 5, 2010, when appellant called to let her know he was bringing dinner home. Appellant testified that he brought Lisa her dinner at the bar at about 10:00 p.m. and returned to the apartment. He testified that about 15 or 20 minutes later, he heard his "dogs in the back barking," so he retrieved his 9-millimeter firearm and "put a round in the chamber" to investigate. Concerned about recent burglaries and vandalism in the neighborhood, appellant looked around behind the apartment, then returned to the bedroom. He continued looking out the window while sitting on the bed with his pistol next to him in the center of the bed. He testified that at that moment, Lisa returned home from the bar intoxicated and became angry that appellant was sitting on her side of the bed. Appellant went to his side of the bed and was preparing to lie down when Lisa picked up the pistol. Appellant testified:

> I don't know if she's going to throw it across the bed or she was just mad or what. . . . I told her, Whoa, whoa, it's loaded. . . . [I]t looked like she was either going to throw it across the bed or get it out of the way or something but it was loaded. . . . . It scared me. . . . So, I grabbed the pistol. . . . [It] just went off. . . . I only heard it go off one time. I just heard it go off the one time and she let it go and was standing there. She called me a stupid MF. I laid the pistol down. I seen she was hurt.

Appellant went to retrieve a towel for Lisa while she sat on the corner of the bed, and when he returned, she had the pistol in her hand again. He took the pistol from her and tried to call for help on his cell phone, but he testified that he had no reception. With his pistol in-hand, he "ran down [to] the bar" to "see if I could get somebody to call 911 for me."

Lisa testified as to a different version of events. She stated that after she came home from the bar, she discovered appellant sitting on the bed looking in the mirror. She testified: "[H]e stood up, turned around and just shot me." After she realized she was shot in the stomach, she grabbed herself and said, "What are you doing?" She stated that she "started yelling at him, telling him he better get . . . some help." She denied that she

2

tried to grab the pistol and testified that she did not even see it in appellant's hands until he fired it. She testified that she "started tasting sulphur" and could not remember anything after that point. She stated that although she was intoxicated that evening, her memory was clear about the events she recounted for the jury.

Appellant was charged with the crime of aggravated assault of a family member based on Lisa's allegations, but the jury found appellant not guilty.

During appellant's trial of the alleged aggravated assault on Lisa, appellant was also tried for committing aggravated assault of a family member against Lisa's brother, Carl St. Cyr., which occurred just after Lisa had been shot. Carl, who had been working at the bar that night, narrated as the jury viewed a video taken from the security cameras in the bar:

> That's [appellant] walking up the sidewalk currently. He enters the bar in this frame. He's drawing a gun out already. That's me getting up. And he sticks the gun in my face and it jammed and he's backing up trying to reload. That's when my mother ran around, hit him and knocked him out the door and then he went back to his house . . . .

Carl testified that appellant entered the bar with a blank stare and never said a word. Carl heard the gun click while appellant had it pointed at Carl's head; then Carl dove for the door. Lisa's mother testified that she saw appellant enter the bar, point a gun at Carl's head, then try to "reload or something" as she "got [appellant] out of the bar and locked the door." She testified that they called 911, but still "didn't know [Lisa] was shot" at that time. A bartender working that night and a bar patron both testified to the same version of events.[1]

The jury convicted appellant of the crime of aggravated assault on Carl, and appellant elected to have the jury assess his punishment.

During the punishment phase of the trial, Lisa testified that on a previous occasion, appellant became angry and purposely pushed Lisa, who then hit her head on

---

[1] Appellant testified that he went into the bar asking for someone to call 911, but that Lisa's mother and brother yelled at appellant to get out of the bar, and he left.

the corner of the bed frame, and then punched Lisa in the face. Lisa's head injury required 13 staples. She testified that she recanted the truth of her allegations to the police about that incident because appellant told her he would have to go to jail for three to five years. The police officer who responded to the 911 call regarding that incident also testified.[2]

The State also introduced the testimony of Carl, who described the emotional and physical ailments he has suffered since the incident on August 5, 2010. He also testified about numerous occasions on which appellant threatened other patrons at the bar. Carl testified: "He's told me he's going to shoot them and blow them away."[3]

The jury assessed a punishment of five years of confinement and a $5,000 fine for appellant's aggravated assault of Carl. Appellant's sole issue on appeal relates to part of Lisa's punishment phase testimony regarding the injury caused by the incident on August 5, 2010:

> Q. Ma'am, let's talk a little bit about the incident that happened on August 5th. How many surgeries did you have to go through due to this incident?
>
> [COUNSEL]: Objection, Your Honor, this isn't relevant to punishment.
>
> THE COURT: Overruled.
>
> Q. (BY [THE STATE]) How many surgeries did you have to go through due to this incident?
>
> A. I was told approximately—
>
> [COUNSEL]: Objection, hearsay, Your Honor.
>
> THE COURT: Sustained.
>
> Q. (BY [THE STATE]) Besides being told, what have—how has being shot affected you since this happened?
>
> A. **I had to have reconstructive surgery on my urethra**.
>
> [COUNSEL]: Excuse me, Your Honor. May I have a running objection to

---

[2] Appellant testified that Lisa pushed him down, and then she fell back and hit her head on the bed. He denied telling Lisa that he would have to go to jail for three to five years unless she changed her story.

[3] Appellant denied ever threatening to shoot anyone in the bar.

any evidence about the injury from August 5th, 2010?

THE COURT: Sure.

[COUNSEL]: Thank you.

Q. (BY [THE STATE]) Go ahead, ma'am.

A. **One of the—I mean, a bullet serrated [sic] my urethra; and so, I had a proxy bag. And I had surgery where they repaired the urethra so I didn't have to wear the bag anymore. That was my last surgery**.

The State asked no further questions regarding the injuries Lisa sustained on August 5, 2010, and introduced no evidence pertaining to the cause of those injuries.

Appellant argues that the trial court committed reversible error by allowing the State to introduce this testimony because it constitutes impermissible relitigation of appellant's guilt or innocence for the alleged aggravated assault on Lisa.

ANALYSIS

An appellate court may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007) (citing *Rivera v. State*, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991)). A trial court abuses its discretion when it acts outside the zone of reasonable disagreement. *Id*. (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)).

Generally, for a case in which there is an acquittal on one of the charges and a conviction on another, "the State cannot relitigate the acquittal at the punishment phase hearing by introducing testimony that is relevant only to the charge on which the defendant was acquitted." *McGee v. State*, 197 S.W.3d 802, 805 (Tex. App.—Houston [1st Dist.] 2006), *aff'd*, 233 S.W.3d at 318. We do not agree with appellant that the State's introduction of Lisa's testimony as excerpted above constitutes relitigation of appellant's criminal responsibility for causing such injuries. The testimony is not relevant to show the cause of such injuries, and the trial court properly could have determined that the testimony was being offered not for the purpose of relitigating appellant's guilt or innocence, but for the purpose of showing that appellant left Lisa in a

severely injured state when he walked next door to commit an aggravated assault on Carl. *See* TEX. CODE CRIM. PROC. art 37.07, § 3(a)(1) (West 2006) (during punishment phase, "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing," including but not limited to "the circumstances of the offense for which he is being tried" and "other evidence of an extraneous crime or bad act"); *see also McGee*, 197 S.W.3d at 805 (trial court properly could have concluded that punishment phase testimony contradicting appellant's guilt-innocence testimony regarding alleged assault, for which appellant was acquitted, was relevant to sentencing as evidence of extraneous offense of perjury committed by appellant).

However, even assuming for the sake of argument that Lisa's testimony constitutes impermissible relitigation, appellant concedes on appeal that such an asserted error would be reviewed for non-constitutional harm under Texas Rule of Appellate Procedure 44.2(b). *See* TEX. R. APP. P. 44.2(b); *Turner v. State*, 252 S.W.3d 571, 585 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("The erroneous admission of evidence is not constitutional error."). Any error other than a constitutional error that does not affect appellant's substantial rights must be disregarded. TEX. R. APP. P. 44.2(b); *Turner*, 252 S.W.3d at 585. Substantial rights are not affected "'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Turner*, 252 S.W.3d at 585 (quoting *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). "In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case." *Id*. We may also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments, and even voir dire, if material to appellant's claim. *Id*.

We first note that the jury already had received Lisa's medical records during the guilt-innocence phase of the trial, and those records document the severity of her injuries caused by the incident on August 5, 2010, as well as the extensive medical treatment she received because of those injuries. Lisa's punishment-phase testimony regarding her need for reconstructive surgery was brief; the majority of her testimony concerned the other instance of alleged assault by appellant. The State also presented testimony from two other witnesses who gave testimony regarding the other instance and the aggravated assault on Carl for which appellant was found criminally responsible. The State did not emphasize or even mention the objectionable testimony during closing arguments after the punishment phase. After examining the record as a whole, we have a fair assurance that the error did not influence the jury, or had but a slight effect. *See Turner*, 252 S.W.3d at 585. We overrule appellant's issue.

## CONCLUSION

Having overruled appellant's only issue on appeal, we affirm the judgment of the trial court.

/s/     Sharon McCally
        Justice

Panel consists of Chief Justice Hedges and Justices Jamison and McCally.

Do Not Publish — TEX. R. APP. P. 47.2(b).